NO. 12-02-00312-CR



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


ALISHA ANDREWS PAYNE,
§
 APPEAL FROM THE 173RD

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


THE STATE OF TEXAS,

APPELLEE
§
 HENDERSON COUNTY, TEXAS

 

MEMORANDUM OPINION


 Alicia Andrews Payne ("Appellant") was convicted of intoxication manslaughter and 
sentenced to seventeen years of imprisonment. In one issue, Appellant contends that the evidence
is legally and factually insufficient to support her conviction. We affirm.


Background


 At around noon on July 31, 2000, Appellant was driving westbound on Highway 334 in
Seven Points, Texas, when she struck and killed Janette Taylor, a pedestrian who was walking along
the highway in the same direction Appellant was traveling. After an investigation by the Seven
Points Police Department, Appellant was indicted for intoxication manslaughter on December 28. 

Appellant pleaded "not guilty" to the charge and her case went to trial on August 19, 2002. The jury
found Appellant guilty of intoxication manslaughter and also found that Appellant had used a motor
vehicle as a deadly weapon during the commission of the offense. The jury also sentenced her to 17
years of imprisonment and imposed a $10,000.00 fine.

 Appellant now challenges her conviction on appeal and argues that the evidence is legally
and factually insufficient to support the conviction because the State failed to prove beyond a
reasonable doubt that Appellant was "intoxicated," as defined in the indictment.


Sufficiency of the Evidence

Standard of Review

 Legal sufficiency is the constitutional minimum required by the Due Process Clause of the
Fourteenth Amendment to sustain a criminal conviction. See Jackson v. Virginia, 443 U.S. 307,
315-16, 99 S. Ct. 2781, 2786-787, 61 L. Ed. 2d 560 (1979); see also Escobedo v. State, 6 S.W.3d
1, 6 (Tex. App.-San Antonio 1999, no pet.). The standard for reviewing a legal sufficiency
challenge is whether any rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt. See Jackson, 443 U.S. at 320, 99 S. Ct. at 2789; see also Johnson v.
State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The evidence is examined in the light most
favorable to the jury's verdict. See Jackson, 443 U.S. at 320, 99 S. Ct. at 2789; Johnson, 871
S.W.2d at 186. A successful legal sufficiency challenge will result in rendition of an acquittal by
the reviewing court. See Tibbs v. Florida, 457 U.S. 31, 41-42, 102 S. Ct. 2211, 2217-218, 72 L. Ed.
2d 652 (1982).

 In considering factual sufficiency, we must first assume that the evidence is legally sufficient
under the Jackson standard. See Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). We
then consider all of the evidence in the record related to Appellant's sufficiency challenge, not just
the evidence which supports the verdict. We review the evidence weighed by the jury which tends

to prove the existence of the elemental fact in dispute and compare it to the evidence which tends
to disprove that fact. Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). We are
authorized to disagree with the jury's determination, even if probative evidence exists which
supports the verdict. Clewis, 922 S.W.2d at 133. However, factual sufficiency review must be
appropriately deferential so as to avoid the appellate court's substituting its own judgment for that
of the fact finder. Our evaluation should not substantially intrude upon the jury's role as the sole
judge of the weight and credibility of witness testimony. Santellan, 939 S.W.2d at 164. Where
there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive.
See VanZandt v. State, 932 S.W.2d 88, 96 (Tex. App.-El Paso 1996, pet. ref'd). Ultimately, we
must ask whether a neutral review of all the evidence, both for and against the finding, demonstrates
that the proof of guilt is so obviously weak as to undermine our confidence in the jury's
determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by
contrary proof. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). We will set aside a
verdict "only if the evidence supporting guilt is so obviously weak, or the contrary evidence so
overwhelmingly outweighs the supporting evidence, as to render the conviction clearly wrong and
manifestly unjust." Ortiz v. State, 93 S.W.3d 79, 87 (Tex. Crim. App. 2002).

Applicable Law

 A person commits the offense of intoxication manslaughter if the person "1) operates a motor
vehicle in a public place . . . and 2) is intoxicated and by reason of that intoxication causes the death
of another by accident or mistake." Tex. Pen. Code Ann. § 49.08 (Vernon 2003). "Intoxicated"
is defined as 


 (A) not having the normal use of mental or physical faculties by reason of the introduction of alcohol,
a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances,
or any other substance into the body; or


 (B) having an alcohol concentration of 0.08 or more.



Tex. Pen. Code Ann. § 49.01(2)(A), (B) (Vernon 2003). A witness does not have to be an expert
to testify that a person he observes is intoxicated by alcohol; therefore, lay opinion testimony by a
police officer that a person is intoxicated is probative evidence that a person was "drunk."
Henderson v. State, 29 S.W.3d 616, 622 (Tex. App.- Houston [1st Dist.] 2002, pet. ref'd). 
However, the rule as to whether a non-expert witness may testify whether a person is under the
influence of drugs is different. Smithhart v. State, 503 S.W.2d 283, 285 (Tex. Crim. App. 1973).
The rationale is that intoxication by alcohol is "of such common occurrence" that its recognition
requires no expertise. Id. When a person is under the influence of drugs, expert testimony must
connect that person's symptoms to a conclusion that he or she was under the influence of a drug and
was incapable of safely operating a vehicle. Id. at 286. Nevertheless, in the absence of direct
opinion testimony, such intoxication may be shown by circumstantial evidence. Id. at 285.



The Evidence

 In support of its case-in-chief, the State called Simon Bennington ("Bennington") to testify.
Bennington stated that on July 31, he and Anthony Murphey, his employee, were traveling in his
work truck westbound on Highway 334 toward Seven Points. At some point in time, Bennington
looked in his rearview mirror and saw a Chevrolet pickup truck, driven by Appellant, "swerving back
and forth across the highway." He stated that the truck was "going every which way" and that it was
"going off the shoulder to the right, it was going into oncoming traffic on the left" by "going across
the white line to the right and across the dotted line to the left." Bennington testified that the truck
was speeding up and slowing down and that the truck maneuvered in this manner for about four to
five minutes. Once the two vehicles traveled into the city limits of Seven Points, Bennington tried
to slow down in order to make the truck behind him slow down as well because he was afraid that
it was going to "kill somebody and have a head-on collision or run me off the road." 

 After his efforts to slow the truck failed, Bennington, a volunteer fireman for Gun Barrel
City, contacted the Seven Points Police Department on his police radio and asked the dispatcher to
send an officer to stop the truck. Bennington continued to watch the truck in his rearview mirror,
and a few minutes after Bennington placed the call, he saw the truck strike Janette Taylor ("Taylor"). 
He noticed that before the truck hit her, Taylor was walking in the same direction he and Appellant
were traveling "about four feet" outside of the "white line," and that he did not have to evade Taylor
when he passed her. 

 As soon as he saw the collision, Bennington notified the dispatcher and drove his truck across
the roadway in order to block oncoming traffic. He then attended to Taylor, noticed that she was still
breathing, and went to the truck that hit Taylor to talk to the driver. When Bennington approached
Appellant, he asked her, "Do you know what in the hell you just did?" Appellant gave no response.

 Delvin Hatley ("Hatley"), a patrol sergeant for the Seven Points Police Department, testified
that when he arrived at the scene of the accident, Aaron Lloyd ("Lloyd"), who was also a police
officer with the Seven Points Police Department, a deputy from the Henderson County Sheriff's
Department, and two officers from Tool were already at the scene. He took some pictures from
Appellant's vantage point in her truck and noted that there was nothing obstructing Appellant's view
while she was driving the truck. After two hours at the scene of the accident, Hatley went back to
the police station, where Appellant and Lloyd were waiting. Appellant consented to taking a field
sobriety test, and Hatley then conducted the "horizontal gaze nystagmus" (HGN) test. (1) The test
revealed that "[s]he had a clear distinct nystagmus, a maximum deviation, and she had an onset of
nystagmus prior to 45 degrees." These six clues (three in each eye) demonstrated to Hatley that
Appellant was intoxicated. However, after Appellant took the test, Chief Daniels, the police chief
of the Seven Points Police Department, decided to release her and she was "at-large for the charges."

 On cross-examination, Hatley stated that although he did not include the fact that he gave
Appellant the HGN test or the results of that test in the narrative report he made, he did recall giving
the test to Appellant. Hatley further testified that the results of an HGN test give good "clues" of
intoxication by drugs and alcohol. He agreed that the HGN test is just one of three standard field
sobriety tests that are sanctioned by the National Highway Traffic Safety Administration, and that
the HGN test, in and of itself, is not necessarily a good indicator of intoxication. He further
acknowledged that nystagmus, or "jerking of the eyes," can occur naturally in a small percentage of
the population or is a result of pathological and neurological disorders as well as brain injuries. 

 On re-direct examination, Hatley testified that other signs of intoxication include a person's
"demeanor, the way they walk, their balance, the way they talk, [and] things they say." He stated that
after Appellant was taken to the police station, she exhibited signs that indicated "some sort of
intoxication." Although Hatley's contact with Appellant was not "extensive," he noticed that her
speech was "poor and slurred," she had poor balance, and she "mumbled some things" that he could
not understand. He also noticed that Appellant exhibited the "highest" and "distinct" form of
nystagmus in each of the clues in Appellant's eyes, and stated that he believed that on July 31,
Appellant did not have the normal use of her mental and physical faculties. 

 Lloyd testified that around 1:00 p.m. on July 31, he was dispatched to the scene of the
accident. When he arrived at the scene, he found Taylor lying on the pavement, receiving aid from
a "civilian." After he checked on Taylor, he went to Appellant's truck in order to determine what
had caused the collision. He began asking Appellant a series of questions, such as "where she was
coming from and if she had anything to drink." He stated that Appellant "referred frequently to her
husband and her husband had left her; she'll never see her husband again; she'll never see her son
again" and that everything she said was ambiguous and not related to the questions he had asked her. 
Appellant appeared drowsy to Lloyd and her eyes seemed "glazed over and without depth." When
Appellant spoke, she spoke "slowly [and] deliberately, but her voice would raise and then drop low
enough where you couldn't hear her." After she spoke to Lloyd, he escorted Appellant to his vehicle. 
During their walk to Lloyd's vehicle, Lloyd kept one hand on Appellant because he thought that she
might fall. Appellant was walking with no direction, and every few seconds Lloyd had to direct
Appellant either verbally or by "pulling on her" to try to direct her to the vehicle because she was
"incoherent" and "didn't know where she was going."

 After Appellant sat down in Lloyd's vehicle, Lloyd summoned the EMS personnel who had
arrived at the scene because he thought that she needed medical attention. After the EMS personnel
attended to Appellant, Lloyd took her to the police station. He confirmed that Hatley performed the
HGN test. Appellant was also asked to perform the "walk-and-turn" and the "one-legged stand"
tests, but she did not perform those tests. Lloyd stated that after Appellant performed the HGN test,
the chief of police decided to release her. When asked whether he would have released Appellant
or arrested her, Lloyd replied that he would have arrested her because he believed that she was
intoxicated. Lloyd testified that Appellant's incoherence, inability to answer questions directly, "the
glazy look in her eyes without focus," and the way that she walked "slumped with no direction and
would turn basically wherever momentum took her" led him to believe that she was intoxicated. 
Although Lloyd did not smell any alcohol on Appellant at that time, he thought that Appellant may
have been drinking vodka because "oftentimes people can drink vodka, become intoxicated, and you
can't smell it on their person." After a search of Appellant's vehicle, however, Lloyd did not find
any vodka bottles. 

 On cross-examination, Lloyd stated that he could not remember whether Appellant had a
"boot on her foot" or if crutches were located in her truck. He agreed with the assertion that if
Appellant's foot was broken or if it had previously been operated on, then she would not have been
able to easily walk to Lloyd's vehicle. Lloyd also acknowledged that he did not write anything in
his report about Appellant being drowsy or that her eyes were "glazed over," but he specifically
remembered Appellant exhibiting those conditions. 

 On re-direct examination, Lloyd stated that after the accident, Appellant told him that Taylor
had walked out in front of her. When asked if she had been drinking and how long it had been since
her last drink, Appellant replied that she had drank one 16-ounce beer "about five hours ago" and
that she was not drunk. Lloyd asked Appellant if she had been injured during the accident, but
Appellant "had an incoherent response." Based upon Lloyd's conversations with Appellant after the
accident, he believed that she did not understand the events that had previously occurred.

 Wade Norris ("Norris"), a deputy with the Henderson County Sheriff's Department, testified
that after he arrived at the accident scene, he parked his vehicle behind Appellant's truck and went
to speak to her. As Norris was talking to Appellant, he noticed that she "appeared to be very
intoxicated at the time and very confused." Although he could not smell any alcohol on Appellant,
he was sure she was intoxicated. When he asked Appellant where she had come from, she "didn't
know where she was at" and "didn't realize she was in Seven Points." Although Appellant told
Norris she was traveling from Gun Barrel City, she did not know the location in Gun Barrel City. 
He further testified that Appellant "acted just like an intoxicated person" because "her speech was
slurred" and that when he asked her if she knew what had happened, she said she did not know. 
When Norris looked inside Appellant's truck, he did not notice any blood or anything on Appellant
to indicate to him that she had been injured. Based on his conversations with Appellant and
observations of her actions, Norris believed that she was intoxicated and as a result, did not have the
normal use of her mental and physical faculties. 

 On cross-examination, Norris agreed that he did not perform any sobriety tests on Appellant
after he arrived at the scene of the accident and that he based his opinion regarding Appellant's 
intoxication on the conversation he had with Appellant. Norris also agreed that when an individual
has slurred speech and the smell of alcohol is absent, that does not necessarily mean that a person
is intoxicated. Furthermore, Norris admitted he could give only his subjective opinion that Appellant
was intoxicated because he was not aware of any field sobriety tests that she performed. 

 Herbert Brydon ("Brydon"), a police officer in Tool, Texas, stated that after he arrived at the
accident scene, he went to Appellant's vehicle to make sure that she did not leave. Officer Norris
later relieved Brydon, and Brydon found a walking cane in a ditch that ran parallel to the highway
as he walked away from the vehicle. Brydon stated that he believed that someone involved in the
accident had been using the cane prior to the accident. 

 Wayne Nutt ("Nutt"), an investigator for the Seven Points Police Department, testified that
on August 4, 2000, he took an oral statement from Appellant at her home. (2) After Nutt explained to
Appellant her Fifth and Sixth Amendment rights, Appellant agreed to talk to him about the accident. 
Appellant stated that at around noon on July 31, she was at work and began to feel sick, so she
decided to go home. As Appellant was driving home, she was "traveling down the road and the next
thing [she] knew, the next thing [she] knew, [she] didn't see the woman and [Taylor] was on the
pavement." All Appellant knew was that she had "[run] over something," so she stopped. Appellant
stated that after she hit "something," she was "in shock" but did not know that she had hit a person. 
Appellant further stated that about two months before August 4, she had fallen through some
bleachers at a rodeo in Kemp, Texas and fractured her foot in two places. She also told Nutt that on
the day of the accident, she had been wearing a "walking boot" on her broken foot and she had
crutches in her truck. 

 Appellant stated that when she got up on the morning of July 31, she had diarrhea, but other
than that, she was fine. She went to work until noon, then started feeling sick. When Nutt asked
Appellant if she recalled telling one of the police officers at the accident scene that she had
consumed a 16-ounce beer about five hours before noon on that day, Appellant denied that she had
made such a statement to the officer and said that she was "not a drinker." Appellant then told Nutt
that on July 31, she had taken 1) Soma, an over-the-counter sleeping aid, 2) Paxil, an antidepressant
medication, 3) Lipitor, for high cholesterol, 4) Synthroid, for hypothyroidism, and 5) Lortab, to
relieve the pain in her foot. Appellant had been taking Paxil for about ten years. She also stated that
she had taken Lortab and Lipitor that morning and again before lunch. At around 11:00 a.m., she
ate a tuna fish sandwich, and shortly after she ate, she began to feel sick and decided to go home. As she was driving home, Appellant told Nutt that she did not feel disoriented. When told
that witnesses said that she was driving erratically, Appellant stated that her "truck was out of line
in the front" and that the truck had a "tire that doesn't really fit." Appellant further said that she did
not "go off in the grass" while driving and that she "never even seen" Taylor as she was driving on
Highway 334. She also told Nutt that the only thing she could remember was that she was "on the
road" and that she was "basically in shock." After the accident occurred and Appellant left the
Seven Points Police Department, an ambulance came to her home and took her to Kaufman Hospital
in Kaufman, Texas because she was in shock. 

 On cross-examination, Nutt could not recall whether Appellant was in a "walking boot" at
the time he took her statement. However, Nutt agreed that he had received information from officers
who investigated the accident that Appellant had been wearing a "walking boot" on the day of the
accident and that the officers had found crutches in Appellant's truck. 

 Amanda Cline ("Cline") worked in the same building as Appellant. She testified that on the
morning of July 31, Appellant told her she was sick and asked if Cline would answer the phone.
Cline noticed that Appellant seemed "like she was sick and kind of shaky-like." After the accident
occurred, Cline stated that Appellant called and when asked if she was alright, Appellant said that
"she didn't remember anything about it, she didn't remember where it happened." 

 When cross-examined, Cline noted that when Appellant arrived to work at 8:30 a.m. that
morning, she seemed fine. Cline also stated that based on her observations of Appellant on the
morning of July 31, nothing indicated to her that Appellant would not have been able to operate a
motor vehicle. 

 Jackie Parchman, ("Parchman"), a forensic pathologist at the Dallas County Medical
Examiner's Office, testified that Taylor died of multiple blunt force injuries she sustained as a result
of being struck by Appellant's truck and that a motor vehicle could sometimes be a deadly weapon. 
Parchman further stated that Soma is "designed to make you get sleepy," "become drowsy and less
alert and fall asleep." She also testified that Lortab is "hydrocodone with some acetaminophen" and
is a "mid-level narcotic" pain medication. She also agreed with the assertion that drinking one beer
could result in that person losing the normal use of his or her mental or physical faculties.

 Anthony Murphey ("Murphey"), a co-worker of Bennington's who was riding with
Bennington at the time of the accident, testified that when he first observed Appellant's truck, it was
traveling behind his vehicle and was "swerving on the outside of the road," meaning that it was
swerving into oncoming traffic. Appellant then corrected her steering and traveled in the proper
lane. Shortly thereafter, Murphey watched Appellant's vehicle drive "off in the ditch" on the side
of the lane she was traveling in. Murphey stated that for thirty or forty yards, one half of Appellant's
truck was off of the roadway. Appellant then steered left, across the proper lane and back into
oncoming traffic. Murphey testified that Appellant drove into oncoming traffic for about twenty
yards and that as she was traveling in the improper lane, other vehicles had to move out of her way. 
Appellant then steered into the correct lane, where she traveled "for some time." Murphey stated
that he did not see Taylor walk into the road and that when Appellant's vehicle struck Taylor, about
one half of Appellant's vehicle was off the roadway. After Appellant hit Taylor, Murphey watched
Appellant pull her truck over onto the side of the road. Bennington then turned the truck around, and
Murphey ran over to Appellant's truck and pulled the keys out of the ignition. 

 Appellant called Terry Jones ("Jones"), a paramedic for East Texas Medical Center, as her
sole witness. Jones stated that on July 31, he was driving the second ambulance that arrived at the
scene of the accident. After he arrived at the scene, he examined Appellant and noted in his report
that she correctly answered questions regarding who she was, where she was located, the time of the
examination, and the event that had just occurred. Jones also said that he found crutches in
Appellant's truck when he went to examine her and that Appellant was wearing a "foot support on
her left foot." When he saw Appellant walking, he noticed that she appeared steady. 

Analysis

 In the indictment, the State alleged that Appellant was intoxicated "by not having the normal
use of mental and physical faculties by reason of the introduction of alcohol, a controlled substance,
a drug, or a dangerous drug, or a combination of two or more of those substances, or any other
substance into the body. . . ." Appellant argues that based on Smithhart, the State failed to present
legally and factually sufficient evidence of her intoxication because there was no expert testimony
to prove that her intoxication was caused by the introduction of alcohol, a controlled substance, a
drug, or a dangerous drug, or a combination of two or more of those substances, or any other
substance into her body. In other words, Appellant contends that "[t]he evidence is legally and
factually [in]sufficient to show the 'by reason of' conjunction required to prove intoxication."

 In Smithhart, the State attempted to prove that Smithhart's intoxication caused a traffic
accident in Lewisville on April 22, 1972. The State based its case on the testimony of one witness,
Gene Bolden ("Bolden"), an officer in the Lewisville Police Department. Smithhart, 503 S.W.2d
at 285. At trial, Bolden testified that when he observed Smithhart, he noticed that Smithhart was
"'incoherent, his eyes were glassy, the pupils were dilated, and he was unsure of himself.'" Id. 
Smithhart told Bolden that he had 1) been to the doctor's office to receive treatment for a broken foot
and received a shot for pain, 2) consumed several shots of vodka earlier in the day, and 3) taken
seven Valiums that day. When the State asked if Bolden had an opinion as to whether Smithhart was
under the influence of drugs, the trial court sustained Smithhart's objection to such testimony on the
basis that no predicate had been laid to demonstrate that Bolden was an expert. Id. Nevertheless,
Smithhart was convicted of driving while intoxicated and was placed on probation for a period of
six months. Id. On appeal, Smithhart contended that the evidence was "insufficient to support the
conviction." Id.

 In its analysis, the court of criminal appeals first noted the general rule in driving while
intoxicated cases that in the absence of direct opinion testimony, intoxication may be shown by
circumstantial evidence. Id. The court also observed that a non-expert witness may express his
opinion that a person was drunk on his observation of the accused. Id. When dealing with an
opinion regarding whether a person is under the influence of drugs, the court held that a non-expert
witness may not testify that a person was under the influence of drugs because the effect from certain
drugs is not like "alcoholic intoxication, which is 'of such common occurrence' that its recognition
requires no expertise. . . ." Id. at 286 (citing Inness v. State, 106 Tex. Crim. 524, 527, 293 S.W.
821, 822 (1926)). Since there was no opinion testimony by a qualified witness as to whether
Smithhart was under the influence of drugs, the court analyzed the evidence to determine whether 
the State had shown, by circumstantial evidence, that Smithhart was intoxicated. Id. at 285. 

 The court noted that the only evidence to support Smithhart's conviction was the testimony
of Bolden that 1) Smithhart's speech was incoherent and his eyes were glassy, 2) the point of impact
of the accident was two feet from the center strip of the highway in the inside lane, 3) Smithhart
stated he had just come from the doctor's office, 4) Smithhart had told Bolden he was taking Valium
and had been drinking vodka that morning, and 5) Smithhart possessed an empty prescription bottle. 
Id. at 285-86. In holding that the evidence was insufficient to support the conviction, the court stated
that 


 [t]he missing essential element is a showing which would connect the symptoms observed by Bolden
to a conclusion that appellant was under the influence of a drug to a degree rendering him incapable
of safely operating a vehicle. Just as there was an absence of evidence to qualify Bolden to give his
opinion on this point, so was there an absence of any other evidence from which the jury could draw
such a conclusion. 



Id. at 286. 

 The instant case is markedly different from Smithhart because 1) expert testimony connected
Appellant's symptoms observed by the officers to the drugs she had taken and 2) the jury could have
relied on circumstantial evidence to determine that Appellant was intoxicated "by reason of the
introduction of alcohol, a controlled substance, a drug, or a dangerous drug, or a combination of two
or more of those substances, or any other substance into the body. . . ." Dr. Parchman testified about
two of the drugs, Soma and Lortab, that Appellant admitted taking on the morning of the accident
in question. She told the jury that Soma is a sleeping pill that makes a person feel "drowsy and less
alert and fall asleep." Dr. Parchman also testified that Lortab is "hydrocodone with some
acetaminophen" and is a "mid-level narcotic" pain medication. Appellant admitted that she had
consumed a 16-ounce beer that morning. Dr. Parchman's testimony, along with the officers'
testimony that Appellant seemed "drowsy," her eyes seemed "glazed over and without depth," had
poor balance, "mumbled some things" that they could not understand, and had "poor and slurred"
speech supports the jury's verdict that Appellant was intoxicated. The description of the way
Appellant was driving immediately before the accident occurred, coupled with Dr. Parchman's
testimony and the officers' description of Appellant's demeanor and her performance on the sobriety
tests, also provided further circumstantial evidence that the jury could have relied on in its
determination that Appellant did not have the normal use of her mental or physical faculties by
reason of the introduction of one or more substances into her body. Therefore, a rational trier of fact
could have found the essential elements of intoxication manslaughter beyond a reasonable doubt.

 With regard to the factual sufficiency of the evidence, the record contains evidence that
Appellant was ill and not intoxicated on the morning of the accident. We note that, as the exclusive
judges of the facts, the credibility of the witnesses, and the weight to be given their testimony, the
jury may believe or disbelieve all or any part of a witness's testimony. Penagraph v. State, 623
S.W.2d 341, 343 (Tex. Crim. App. 1981) ("A jury is entitled to accept one version of the facts and
reject another or reject any of a witness's testimony."). Where there is conflicting evidence, the
jury's verdict on such matters is generally regarded as conclusive. See VanZandt 932 S.W.2d at 96. 
Therefore, the jury was free to believe either the eyewitnesses', the officers' or Jones's version of
the facts. The jury chose to believe the eyewitnesses' and the officers' accounts of what they saw,
and what they witnessed supports the jury's determination that Appellant was intoxicated on the day
of the accident. Therefore, the evidence supporting guilt is not so obviously weak, nor does the
contrary evidence so clearly outweigh the supporting evidence, as to render Appellant's conviction
clearly wrong and manifestly unjust.

 Appellant's sole issue is overruled.


Conclusion

 Based upon our review of the record, we hold that the evidence is legally and factually
sufficient to support the jury's verdict of guilt. Accordingly, the judgment of the trial court is
affirmed.




 SAM GRIFFITH 

 Justice



Opinion delivered August 29, 2003.

Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.






(DO NOT PUBLISH)
1. Hatley testified that he was certified in giving the HGN test and that in order for him to have obtained that
certification, he had to 1) complete a course on the test and 2) give the test a certain number of times within a certain
period of time after completing the course.
2. Appellant objected to her statement prior to trial and prior to the introduction of the statement on the basis
that Appellant did not intentionally, knowingly and voluntarily waive her right against self-incrimination before she
gave the statement. The trial court overruled Appellant's objection, and she does not challenge the trial court's
ruling on her objection on appeal.